600 So.2d 490 (1992)
Louis POLIZZI, Appellant,
v.
Jennifer L. POLIZZI, Appellee.
No. 91-903.
District Court of Appeal of Florida, Fifth District.
May 29, 1992.
*491 Hal Uhrig of Cotter, Uhrig & Valerino, P.A., Winter Park, for appellant.
James J. Disser, Winter Park, for appellee.
DAUKSCH, Judge.
This is an appeal in a marriage dissolution case. Because the trial and the judgment were separated by a long time period and because the oral pronouncements at trial differ with the holdings in the judgment and because the judgment was signed just before the retirement of the trial judge it is appellant's position that the judge did not properly act. Upon a close reading of this matter we are convinced the judgment cannot be supported and that a new trial is warranted, as to all issues except the dissolution of the marital bonds.
The other errors alleged by appellant are now moot and nothing should be considered law of the case.
Finally, we are moved to criticize and suggest the abandonment of what counsel says is a practice of some judges to have each counsel prepare a proposed judgment before trial and submit it to the court at trial. This practice could create an appearance to lawyers and litigants that they are not being heard fairly at trial. Additionally, experience shows that rarely does evidence come out as planned and that issues are resolved or expanded quite often during trial, especially in domestic cases.
The judgment is reversed and this cause remanded for a new final hearing.
REVERSED and REMANDED.
HARRIS, J., concurs specially with opinion.
W. SHARP, J., dissents with opinion.
HARRIS, Judge, concurring specially:
This case involves two issues: first, the obligation of the court to rule within a reasonable time so that it can be expected to recall the testimony and demeanor of the witnesses as well as the dynamics of the trial and second, the misuse of the doctrine of judicial discretion.
The trial judge in this case waited over three months to rule, and finally ruled literally as a final act before retirement; his ruling was reflected in a slightly modified judgment pre-prepared by the wife's counsel. The judgment was actually "rendered" almost two weeks after he left office.
It is true that the dockets of trial judges are often overloaded and that clerical help is sometimes in short supply, but this condition does not justify the court in, in effect, delegating its decision-making authority (obligation) to one of the attorneys of record. It is one thing to direct one of the attorneys, as an officer of the court, to prepare a judgment in accordance with specific directions by the trial judge after the evidence is in and his decision is made; it is quite another to permit (order) the attorneys to prepare a judgment in accordance with their view of what the evidence shows  or, as in this case, might ultimately show. Both procedures address the problem of lack of clerical help; but the second procedure (the one used in this case) can lead to a situation in which the attorney decides certain issues not even contemplated by the judge.[1] The record here reflects that the trial judge, because of a heavy caseload, the passage of time and his impending, immediate retirement, may *492 have deferred to trial counsel in deciding this case.
The dissent urges that the evidence "justifies" the decision made by the trial court. I disagree. The dissent admits that an award of $800 per month child support (not to mention the other very generous financial obligation imposed by the court), is perhaps "somewhat high" in light of the husband's $588.74 per month earnings. Indeed lay observers will conclude that to stretch the husband's income so far will require a miracle not unlike the feeding of the multitude with five loaves and two fishes. Appellate judges, seemingly unconstrained by economic reality, sometimes find such financial miracles in the doctrine of judicial discretion. But to so cavalierly apply the doctrine in a case such as this is to create an inevitable civil contempt. And that will place the husband's father (the source of the income flow relied on by the dissent) in the inequitable position of having either to continue his largess to his grandchildren and former daughter-in-law or face the prospect of seeing his son languish in jail.
Consider the undisputed facts. The husband came to Florida as a newly married podiatrist. In order to assist him in starting his marriage and practice, his father loaned him and his new wife $42,000 in December, 1985. He opened his practice in Orlando in January, 1986, and was the only podiatrist within a ten mile area. His practice flourished and in 1987 he had an income of $42,000  even though he was not board certified and had no staff privileges at the local hospital.
Unfortunately, four new podiatrists who were board certified and who did have staff privileges opened practices within two miles of his office. They were members of HMO's and thus health plan patients were referred to them. Because Polizzi had not completed a residency program, he was not eligible to serve the HMO's. His income dropped to $17,890 in 1988 and to slightly over $7,000 in 1989.[2] The week before trial, he saw only six patients.[3]
He suggested that his wife return to work and that they move into a smaller house so that he could complete his residency and become board certified. Instead, she took their child and moved to Cleveland.[4]
*493 Throughout the trial, the judge expressed concern about the financial condition of the parties and the fact that the children might be removed from Florida and the additional consequences of that move. He gave some indication of his thoughts concerning the problems and what he might do relative to them. These thoughts and solutions, without explanation, did not make their way into the final judgment.
The final judgment is contrary to the trial judge's trial pronouncements in the following instances.
1. Visitation: The court recognized that both parents were entitled to "quality time" with the children. The indication was that he would pattern a reasonable visitation schedule, including summer visitation and alternating holidays, consistent with the children living in Ohio. The final judgment, on the other hand, merely grants a general visitation privilege if the father pays 3/4 the cost of visitation. Under the final judgment, the husband cannot enforce visitation. Therefore, although the court acknowledged at trial that the father was entitled to quality visitation, the 11th hour final judgment only gave him enforceable visitation after mediation or after future court action. I disagree with the dissent which indicates that it is appropriate for the judge in a final judgment to leave the issue of visitation to mediation. It is the function of the judge at final hearing to give both parties enforceable rights.
2. Personal Property: At trial the court indicated that if the parties could not agree as to the distribution of personal property, a subsequent hearing would be required. The final judgment instead awarded the wife all property requested by her on the exhibit filed by her attorney and referenced in his pre-prepared final judgment. Even if the distribution is fair, and I take no position on this, the way the decision was made has denied the husband an opportunity to argue the issue before the trial court.
3. Support: The court, during the trial, acknowledged that the husband "has got a limited income right now. He's struggling trying to stay out of bankruptcy." The court indicated that it would impute some income to the wife. This indicates that the court believed the husband's evidence relating to his income.[5]
Based on the only credible evidence before the court, the husband in 1989 had an income of $7,065 or about $600 per month. The dissent urges that there is also evidence that he might have earned $1,332.38 per month.[6] But the final judgment requires *494 him to pay $800 per month child support, $200 per month alimony, maintain a $100,000 life insurance policy, pay $4,500 to the wife as "the replacement value of her vehicle,"[7] pay the wife $15,000 as a part of the "equitable division" of the marital assets (the husband, after all, was awarded the marital home which was in foreclosure[8] and the "ownership of his leased vehicle") and the husband was ordered to pay all debts to his father and hold the wife harmless. If he wants to see his children, he must also come up with 3/4 of the travel expenses. I disagree with the dissent that this award is justified by the evidence. Nor do I believe that the magic of judicial discretion will make it possible for the husband to meet these obligations at this time. Certainly if the husband is given an opportunity to do his internship and become board certified and obtain staff privileges, he will then be able to pay reasonable support.
The proposition that although the testimony is that the husband only earns $588.74 per month,[9] still the award requiring $1,000 a month in support plus other "fringe benefits" is justified because the husband can find a better paying job (without indicating that such other job is now available or its salary) or because the husband's average income over a four year period would justify such award (even though he is not earning his average now) or because the husband may be hiding income from his six patients per week (although there is no such evidence), or the check register analysis shows $38,918 was written during 1989 (even though almost $30,000 of that was borrowed money) is reminiscent of Marie Antoinette's famous statement, in which she, on being informed *495 that the French people had no bread, responded: "Let them eat cake".
To require the impossible based on the doctrine of judicial discretion or presumed correctness is indefensible in this case.[10] Some urge that appellate courts can no longer remedy the unreasonable, only the absurd. Even though I believe this case meets that standard, I do not so narrowly construe our authority.
However, the question in this case is not whether the judgment is supported by the evidence; the issue is whose judgment it is. The court advised counsel at trial that he would make his decision either the evening of the trial or, at the latest, the next day. Instead, three and a half months later, while preparing to vacate his office, he finally signed one of the proffered judgments edited only slightly.[11] This does not evince a deliberative decision to which every party is entitled.
Justice requires a new trial. I concur in the reversal.
W. SHARP, Judge, dissenting.
I would (for the most part) affirm this judgment because I disagree that the manner in which the trial judge handled the case was fundamentally defective, and I think there was substantial evidence to support the judgment being appealed.
The form of the judgment was apparently prepared in advance of trial by appellee's attorney (as required by the pretrial order of the trial judge) but it was not adopted carte blanche. The trial judge struck through portions and added phrases in his own handwriting. Ideally each judge should prepare his own judgment, after all hearings are complete. But nothing is perfect in today's judicial system. Crowded dockets and an insufficient number of legal assistants and clerical help for trial judges are some of the reasons why judges commonly ask trial attorneys to prepare proposed judgments in complex cases.[1] Given the circumstances under which our trial courts are operating, I do not think we should fault trial judges for this practice.
The parties' petition for dissolution was filed January 12, 1990. A trial date was set in July for a non-jury trial in September. The trial was held September 12, 1990, and it lasted approximately four hours. The judgment was signed by the trial judge on December 31, 1990, and filed with the clerk on January 10, 1991. A motion for rehearing was filed January 22, 1991 and was denied March 22, 1991. This appeal followed. As a result of the majority opinion in this case, the parties will have to start over again from where they began almost two years ago.
This court has never held that a delay of any length of time (here approximately three and one-half months) between the trial and the rendering of a final judgment so flaws the process that the judgment *496 must be thrown out.[2] Written judgments may postdate the hearing of testimony by considerable time periods for various reasons. In dissolution cases tried without a jury in Florida, judges may hear portions of the testimony over a long time period. They may need to do additional research, may wish to review the testimony or their notes or the documents in the record and reflect on what is the best outcome and resolution of the problems and conflicts posed. No rule or statute mandates entry of judgment within any specific time. Even appellant has not argued the judgment should be reversed for lack of timely rendition.
I agree with the majority opinion that judgments rendered by incompetent, forgetful and dilatory trial judges should be attackable on appeal on those grounds. But in such a case the appellant should raise those challenges at the trial court level, as well as on appeal, and make a sufficient appellate record to sustain them. That was not done in this case.
I disagree that the record in this case shows (on its face) that the trial judge failed to recall the trial testimony. There are no major discrepancies between what the trial judge said at trial and the provisions of the judgment being appealed. The only "inconsistency" concerned visitation provisions, discussed below. Nor does the fact that the trial judge retired shortly after rendering the judgment appear to me as relevant, absent some additional showing that the judgment was attackable on the grounds suggested above.
Rather than departing from the appellate record and even the arguments raised on appeal by the appellant, I think we should give this case a normal appellate review. This means attributing to the judgment the presumption of correctness[3] and viewing the evidence and all inferences therefrom in favor of the appellee.[4] Although there was "contrary" evidence presented at trial, as outlined by Judge Harris in his special concurring opinion, that is not controlling or even significant at the appellate level. It is the job of the fact-finder (trial judge) to resolve conflicts based on the witness' credibility and other contrary evidence, and the appellate court must affirm, unless there was no evidence, or only a scintilla, to support the judgment.[5]
Appellant's points on appeal are: the judgment is somewhat inconsistent with statements made at the trial regarding allowing the two minor children to remain in Ohio with the wife as primary custodian; the wife should not have been awarded primary custody; the $800 per month child support award was too high; the wife was not entitled to rehabilitative alimony of $200 per month for twenty-four months; the court erred in equitably distributing the marital assets and liabilities; and the court erred in granting the wife attorney's fees and costs.
For all of these points raised by appellant (except the award of attorney's fees) there was substantial and competent evidence in the record to support the judgment being reversed. With regard to custody of the children, the parties stated to the trial judge at commencement of the trial they agreed the wife should have primary custody. At the end of the hearing, the trial judge stated he thought it was proper to let the wife continue to reside in Ohio with the two children. The judgment is consistent with his oral statements as well as the evidence adduced at trial.
*497 At the time of the trial, the oldest child (a daughter) was only two and one-half years old and the wife had always been her primary care-giver. The son was only four weeks old, a breast-fed infant, who was actually born in Ohio some months after the parties separated. The parties originally came from Ohio and had only lived in Florida four years prior to their separation. The wife (then pregnant) returned to Ohio to live with her mother, in the home in which she had been raised.
Returning to Ohio was her only and probably best solution after the parties' separation. In the Cleveland area she had 120 relatives and many friends and contacts. She had support and help with the babies and was attending college in order to earn a degree in nursing. She testified she wanted to prepare herself to obtain a higher paying job than those she had previously held, so she could properly raise the children. She testified she was willing to actively encourage visitation with appellant.
Judge Harris suggests that the wife left because she did not want to move into a smaller home and obtain employment outside the home while the husband completed his residency and became board certified. To the contrary, the record strongly infers that the wife left because the husband was physically and emotionally abusive. The husband, himself, admitted to being "physically aggressive" twice with his wife. Once the husband held her up against the garage wall (R 33). The other incident occurred after the wife told the husband that she was not going to take any more abuse. The husband said to her: "Would you like to see abuse?" and smacked her on her cheek (R 36). The wife then called the police.
The wife further testified that after their daughter was born, the husband started to hit and choke her. The wife begged the husband to go to counselling but he refused. The wife left the husband the first time for a few weeks. During this time, the husband got rid of the family dog (R 56-57). Just prior to her leaving the second (and final time), the husband took the keys to her car, took the infant's car seat, closed the parties' checking account and cancelled their American Express card. The husband also told the wife that if she left him, he would cancel her health insurance. The husband never called and asked how her second pregnancy was going and never sent any financial support (R 55-57, 81-83).
After the wife fled this unhappy marriage and returned to Ohio with little more than her clothing, the husband sold her car, the nursery furniture, cancelled the wife's credit cards and health insurance, and appropriated their joint account. At the time of trial, the marital home was in foreclosure. There was literally and practically no place the wife could reasonably be expected to reside in Florida with the children, given the circumstances established at trial.
The judge was concerned about affording the husband reasonable visitation, considering the logistics and the young ages of the children. At the trial, he indicated he wanted the husband to have liberal and reasonable visitation. He discussed various plans of alternating major holidays and long visits with the husband during the summer. In the judgment, he ordered that the husband should have "standard visitation."
There are no major discrepancies between the judge's oral statements and the judgment. Although there are no "standard" visitation rights as defined by any rule or statute, the order also provided that if any dispute arose, the parties should seek mediation. Appellee agreed to do so at the trial. In view of the ages of the children, the court's ruling does not appear to me to be an abuse of discretion. Mediation might well be the best way to work out a more specific visitation schedule (if the parties are unable to do so) suitable for these very young children, which will work for these parties' schedules and life-styles. Had the trial court promulgated a specific visitation schedule for these very young children, on its own, it might well not have been workable. The parties should first have resorted to mediation and failing that, *498 appellant could then apply to the trial court for a specific schedule. Only after these steps were completed should the appellate court intervene.
At the trial, the judge also said both parties should pay towards the cost of visitation. He noted, however, that it would be a "hardship" for both of them because their economic circumstances were "poor." In the judgment, the husband was required to pay three-quarters of the cost. This is sustainable on appeal because at the time of trial, the wife had no job or income, she was on welfare, and she was being maintained through the charity of her own family. I find no discrepancy here between the trial judge's statements at trial and the final judgment.
With regard to the balance of the judgment, the award of $800 per month child support appears high, given the husband's testimony that his podiatric practice was recently failing and that he only earned $588.74 per month in 1989. However, the husband had earned an average of $1,332.38 per month or $15,988.56 per year since he started his practice. Further there was evidence that he could earn more if he made other work arrangements. Also, there was evidence he received additional cash income, unaccounted for in the reported income figures.[6] Despite the husband's claim that he only earned $7,065 in 1989, the parties wrote checks totalling $38,918 for that same year.
With regard to the rehabilitative alimony award, the amount, length of time payable and purpose appears to be within the trial court's discretion.[7] The wife testified she would have to go to school five years to earn a nursing degree and she was currently unemployed and surviving on medicaid, food stamps, aid to dependent children, and her family's support. From the transcript of the trial it appears the court made a low award because it was imputing income to her for a part-time job, and the alimony award will not last long enough to permit her to earn her nursing degree. The award appears to be within the court's discretion to enable the wife to work only part-time while her children are still infants, and to get started on a new direction in her life.
The court's distribution of marital assets and liabilities also does not appear beyond the trial judge's discretion. The trial court awarded the husband the exclusive possession and ownership of the marital residence and ordered him to assume the mortgage debt on it,[8] and hold the wife harmless for such debt. This is consistent with the court's oral pronouncements at the trial. At the trial, the judge said the wife should immediately quit-claim the marital residence to the husband, which she apparently did before returning to Ohio.
The judgment also directed that the contents of the marital residence be divided in accordance with personal property lists submitted by the wife. These lists indicate that personal property retained by the husband was valued at $12,598 and that retained by the wife was valued at $5,189.[9] At the end of the trial, the court told the parties to "work out" the division of their personal property themselves. He orally reserved jurisdiction to hold further hearings, if the parties could not work this division out. None were apparently required *499 because neither party asked for a further hearing.
The husband also retained possession of his leased vehicle,[10] but was ordered to pay appellee $4,500 as "the replacement value of her previously owned vehicle."[11] The parties retained jewelry in their respective possessions. Finally, the husband was ordered to assume all liability for the personal notes payable to his father,[12] and was ordered to pay the wife the lump sum amount of $15,000 "to effectuate a total equitable division of the marital assets and liabilities."
Appellant first challenges the equitable distribution award because the trial court did not make any findings of fact in support of it and therefore "we do not know the critical findings of fact which were the foundation for the trial court's decision." Haas v. Haas, 552 So.2d 221, 224 (Fla.2d DCA 1989). The first district has held it is "appropriate to require explicit findings with respect to disputed facts that form the factual basis on which a trial court undertakes to award equitable distribution." Barrs v. Barrs, 505 So.2d 602, 604 (Fla.2d DCA 1987). Other courts have declined to adopt a "hard and fast" rule on this matter. Danoff v. Danoff, 501 So.2d 1361 (Fla.4th DCA 1987); Zalis v. Zalis, 498 So.2d 505 (Fla.3d DCA 1986). Although I personally agree with Haas, this court has chosen not to address that issue.[13]
However, the wife is correct in asserting that her $15,000 marital property distribution can be supported by the value of other marital property distributions to the husband. The husband retained sole ownership of his medical practice, which had a "patient load" of 300 to 1000 patients per year. Even if his medical practice had a zero value, the wife signed over her interest in the marital residence to the husband, which was worth between $6,500 and $13,000. The husband also retained the marital personal property in the residence which exceeded the wife's share by $7,409.
However, with regard to attorney's fees, the husband correctly argues there was no testimony or any other competent evidence substantiating the awards of $6,500 and $1,700. The wife states that both parties stipulated to the introduction of affidavits regarding attorneys fees, but points to no document in the record which demonstrates there was a stipulation on this matter. Thus the instant award is defective for failure to fully comply with the requirements *500 of Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145 (Fla. 1985).
In summary, in my view, the dissolution judgment in this case should be affirmed in all regards except for the attorney's fee award. This cause should be remanded to the trial court for the sole purpose of properly determining the amount of attorney's fees which should reasonably be paid on behalf of the wife. Neither party should be put to the trouble, harassment and expense of a new trial on all issues (save the dissolution of their marital relationship).
NOTES
[1] In fairness I should add that my criticism of pre-prepared judgments is not shared by all judges of this court. Such judgments are seen as ways "to make the attorneys prepare for trial" and to "encourage settlements." If the first reason is truly the judge's function, it can better be met by conducting meaningful pretrial conferences. Settlements can be better encouraged by reference to mediation. I do not suggest that this procedure is improper or that judges who utilize it cannot make an informed and reasoned decision; I criticize it because it is unnecessary and can easily lead to abuse.
[2] These figures are from the parties' joint tax returns.
[3] This was the testimony of his office manager. The dissent justifies the $15,000 marital distribution on the basis that the husband received the medical practice with a "patient load" of 300 to 1,000 patients per year. This ignores the fact that the 1,000 patient year was in 1987 when the husband had no competition. The 300 patient load is the reality when the distribution was made and it is apparent that such load does not indicate a successful practice.
[4] The purpose of the statement is two fold. First, to respond to the dissent's statement that Polizzi should make "other work arrangements" in order to meet the support demands of his wife. Second, to show that he was anxious to change his current employment problems by improving his credentials even before the dissolution.

The dissent instead interprets this as a statement of why the wife left the marriage and then justifies her leaving based on her testimony of abuse. This requires response.
First, the wife's reason for leaving needs no justification because it is irrelevant to the issues of distribution of marital assets, child support, or rehabilitative alimony  unless the dissent is suggesting that these awards can also be assessed as punitive damages resulting from the husband's alleged wrongdoing. Second, even the wife's counsel in his judgment signed by the judge made no finding of spousal abuse. And at least one of the husband's two admissions of being "physically aggressive" with the wife relied on by the dissent was as follows:
It was an argument and my wife has a temper. And she throws things at me. She threw a book at me. That particular day this was outside the garage, she was swinging at me. I took her wrist and my forearm and I held her up against the wall.
Violence directed by or at either party should not be condoned.
Third, even after all the alleged violence, the wife returned to the husband for a period of about two weeks. Then this conversation ensued: (Husband's testimony).
I'm doing everything I can for my practice. I wanted to go back to school to get my residency training. I asked my wife to go to work. I said: "If you're not happy, let my mother baby-sit. Go to work and help out".
This was a conversation a week before she left. I tried everything to make my practice work including selling my house two years ago. She didn't want to move to a smaller house. She told me she doesn't want to raise her children in a condo or an apartment. I said: "That's what we need to do". I didn't get that. She told me and her mother told me also. It shouldn't be that way when you're married to a doctor.
My wife told me she did not think it would be that hard being married to a doctor.
(Wife's testimony):
Did you ever say to your husband that you never anticipated life being this way being married to a doctor?
We both said that. He was very disappointed, too.
The reader can decide why the wife left the marriage if such issue is important. But at the very least, the wife's statement acknowledges the family was having serious financial difficulties and belies any implication of a hidden source of income.
[5] The indication of "unaccounted for" income referred to by the dissent is based on the testimony of the wife that when she was secretary for a business being operated by her husband and his brother-in-law that she would divide the cash payments between her husband and his brother-in-law. Their cash was kept at home and, impliedly, not reported for tax purposes. Even if the wife is believed on this point, and there is no indication that the judge did believe her, still there is no evidence that cash was being diverted in the operation of the present business. The wife testified that when she occasionally worked in the present business that even she would give receipts for cash payments and there is no indication that copies of the receipts were not properly kept in the business records. Further, she did not testify that she ever saw "socks" of money from the present business  indeed, her complaint was that there was insufficient money. In addition, the office manager testified that, except for petty cash which was kept in an envelope, all cash and checks went into the bank deposit. There is simply no evidence to justify the dissent's suggestion of unreported income from the husband's business.
[6] But this was Polizzi's statement in his brief concerning his average income for the four year period  1986, 1987, 1988 and 1989. One cannot pay support now based on an income flow that was enjoyed four years earlier. The dissent also suggests that the fact that $38,918 in checks was written from the parties' account in 1989 suggests a higher income than testified to by the husband. But included in the account during that year were deposits of $29,419 admittedly borrowed from his father. How can anyone suggest that this is income? Assuming only a small balance at the beginning of the year, the check register fully supports the husband's testimony.
[7] This provision is most misleading. The record reflects that the wife disposed of her vehicle before the marriage and that a new vehicle was purchased, again before the marriage, by the future husband but for her use and placed in the future husband's name. There was no testimony taken concerning the cash value of either vehicle  hers or the one purchased for her. During closing argument, after testimony had ceased, her attorney asserted that her car, four or five years previously, had a value of $4,500. In response to a question by the judge, again during closing argument, the wife repeated her attorney's figure. It appears that this $4,500 figure was placed on the vehicle previously in her name and disposed of prior to marriage. In any event the $4,500 value asserted first during closing argument seems inconsistent with the wife's trial testimony concerning the 1980 Turbo Trans Am:

Q. What happened to that vehicle?
A. A couple weeks before we got married it sprung an oil leak I think under the master cylinder or something and it would have been so costly to repair that Lou and I had decided that we would buy something that wasn't  it was better mileage, you know, something dependable.
So we agreed on and look[ed] for and found a Plymouth Horizon that we agreed to purchase.
Q. And whose name was that vehicle in?
A. It was in Lou's although all the time I thought it was going in both of our names.
There is no indication in her testimony that the Trans Am was traded in on the Plymouth  or that if the Trans Am was sold, that she did not receive the sales proceeds. Yet the court has ordered the husband to pay the wife $4,500 for a car sold before the marriage when that car, according to the wife, was not worth repairing.
[8] Here the dissent urges that the husband's father should "bail the parties out of the foreclosure" and thus save the wife's equity in the home. Although the father expressed a reluctant willingness, in order to save their good credit rating, to bail them out of the foreclosure, he expressly stated he would not give them any more money. The only possible interpretation of this is that he would take the house for the amount of the mortgage but that neither would receive any equity in the exchange.
[9] Even the wife in her testimony acknowledged this limited income:

Q. Tell me what , what you perceive the quality of the children's life will be if they're allowed to remain in Cleveland as against  what they would be here in Florida?
A. Well, considering my husband's terrible finances, I think they would be better in Cleveland. Because my husband on $500 a month, I don't know how anybody could do anything.
[10] Perhaps it is time that we join the Third District in requiring that if the trial court imputes income to a party, it must set forth the amounts it imputed and the source of this income. Levine v. Best, 595 So.2d 278 (1992); Seilkop v. Seilkop, 575 So.2d 269 (Fla.3d DCA 1991). This would help avoid the injustices created by judicially imposed presumptions.
[11] The dissent suggests there are often reasons for a delayed decision  continued hearings, additional research or review of the testimony. There is nothing in the record to suggest any of these conditions caused the delay in this case. A more likely reason, based on this record, is that the judge simply forgot about the case until he was clearing his office at the time of retirement. Further, the dissent suggests that we have not previously set a time in which the judge should rule. But Rule 2.055(f), Rules of Judicial Administration, creates a duty on the part of the judge to rule within a reasonable time and strongly suggests that 60 days would normally be the outside limit. Certainly a ruling after 60 days which is contradictory to earlier pronounced intentions is too long.
[1] "The judge may direct the attorney for the prevailing party to prepare a form of judgment in accordance with the decision. The judge may prepare his own judgment. Unless the judge has thoroughly reviewed the file, this can be a risky undertaking. Few judges are as familiar with an action as the attorneys who tried it. It is better to direct one of them to prepare the judgment unless the judge can take the time to study the entire record before dictating the judgment. The judge should notify all attorneys of the direction." H. Trawick, Florida Practice and Procedure § 25-9 (1991 ed.).
[2] Perhaps the Florida Supreme Court should consider adopting a rule or policy covering timely rendition of judgments, but we should not do so on an ad hoc basis.
[3] Vandergriff v. Vandergriff, 456 So.2d 464 (Fla. 1984); McNair v. Pavlakos/McNair Development Co., 576 So.2d 933 (Fla.5th DCA 1991); Boylan v. Boylan, 571 So.2d 580 (Fla.4th DCA 1990); Wright v. Wright, 431 So.2d 177 (Fla.5th DCA 1983).
[4] Blue Lakes Apartments v. George Gowing, Inc., 464 So.2d 705 (Fla.4th DCA 1985); Lurio v. Lurio, 443 So.2d 197 (Fla.3d DCA 1983); Arnold v. Taco Properties, Inc., 427 So.2d 216 (Fla.1st DCA 1983).
[5] Plaza Builders v. Regis, 502 So.2d 918 (Fla.2d DCA 1986); Malver v. Sheffield Industries, Inc., 502 So.2d 75 (Fla.3d DCA 1987); International Community Corp. v. Orange Entertainment Center, Inc., 490 So.2d 169 (Fla.5th DCA 1986).
[6] The wife testified that she was employed as a secretary in the husband's professional practice when he had a second office with his brother-in-law. The wife further testified that she kept a separate ledger for cash and that the cash was disbursed equally between her husband and his brother-in-law. The husband kept the cash in a sock in the bedroom closet and used it to buy furniture and other things. The wife testified that there were thousands of dollars in the sock and that the supply of cash was constantly replenished.
[7] Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980).
[8] The wife valued the marital residence at $110,000 (R 252); the husband valued it at $94,000 (R 257). The mortgage was for $84,000 (R 258). The house was in foreclosure but at trial, the husband's father testified that he would be willing to bail the husband and wife out on the house (R 19). Using the wife's valuation, the equity in the house would be $26,000 or $13,000 each. The husband was awarded the ownership of the house.
[9] The husband was awarded $7,409 more in personal property.
[10] Despite his claims of poverty, the husband was able to lease a vehicle for $20,000 (R 258), with a lease payment of $393 per month (R 60) and to obtain a business credit card (R 50). The husband testified that he sold the wife's car within a month or two after she left (R 57). The wife testified that the husband took the keys to the car before she left, telling her that "as long as [she] was being a smart ass ... [she] was not allowed to have a car" (R 100). The husband also sold the family's motorboat and sailboat, sold the nursery furniture and closed the parties' joint account (R 55, 61, 100). There is no indication that the wife received any of these proceeds.
[11] Judge Harris states that this provision is misleading and that the only evidence of value was from the wife's attorney. This is incorrect. The wife testified that she owned a Trans Am prior to marriage and that the parties traded it in for a Plymouth Horizon. Although the wife thought the vehicle was going to be in both names, the husband had the car titled in his name only. The husband later traded this vehicle in for his leased Mazda (R 91-92). The wife, not her attorney, testified at trial that the replacement value of her car was $4,500:

MR. DISSER [Wife's Counsel]: There was just one other thing, your Honor. That was in the opening statement. That was about the automobiles. And my client's vehicle, I believe the testimony showed that went to a marital automobile and then that automobile was converted into the [Husband's] leased vehicle.
And the value of her vehicle four or five years ago was $4500 and it was paid for and we're just asking for that amount. It won't get her a vehicle probably but 
THE COURT: The value is how much?
MRS. POLIZZI: $4,500.
(R 154).
[12] The husband's father "loaned" the husband and wife $42,000, $15,000 and $14,000 (R 20). The father testified that the money had not been repaid (R 20), possibly indicating that these loans were in reality gifts. In addition, the wife had never signed the notes for the $14,000 and $15,000 distributions to the husband (R 20).
[13] This defect has fortunately been remedied by section 61.075, Florida Statutes, effective July 1, 1991. Specific findings of valuation and identity of marital assets will have to be made in contested cases pursuant to section 61.075(3).