721 So.2d 335 (1998)
FORD MOTOR COMPANY, Appellant,
v.
Robert STARLING, Appellee.
No. 97-1567.
District Court of Appeal of Florida, Fifth District.
October 9, 1998.
Rehearing Denied December 9, 1998.
Diane H. Tutt and Sharon C. Greenberg, of Diane H. Tutt, P.A., Plantation, for Appellant.
*336 Michael Fender, Maitland, for Appellee.
HARRIS, Judge.
Robert Starling purchased a new 1995 Coachmen recreational vehicle for the total price of $59,589.95. Soon after purchase, he encountered a "howling or whining noise" emanating from the rear of the vehicle. He duly returned the vehicle for repair three times without success and then filed a claim under the Florida Lemon Law Arbitration Program against both Coachmen, the coach builder, and Ford, the chassis builder.
At arbitration, Coachmen moved to be released from the proceedings because the "howling noise in the rear of the vehicle" was related to the chassis (Ford's obligation) and was not related to the coach. Coachmen was released from the arbitration proceeding because the Arbitration Board determined: "Ford stipulated to the dismissal and waived its right to assert as a defense that Coachmen is liable for the alleged nonconformity."
The arbitrators then found:
An inspection of the subject vehicle was performed by the Board in the presence of the Consumer and Ford's attorney. The vehicle was driven at varying speeds up to highway speeds. A distinct rear end noise, characterized as a whine, was heard above the road noise created by the vehicle and was audible over normal conversation. As the vehicle warmed up, the whine noise increased significantly. The noise was very loud and annoying to persons seated in the rear of the vehicle.
The arbitrators also found as a conclusion of law:
3. A nonconformity is defined as a "defect or condition that substantially impairs the use, value or safety of a motor vehicle, but does not include a defect or condition that results from an accident, abuse, neglect, modification, or alteration ... by persons other than the manufacturer or its authorized service agent." § 681.102(15), Fla. Stat. (1993).
The arbitrators then concluded:
"Upon consideration of the testimony and evidence presented by the parties, in conjunction with the Board's test drive of the vehicle, it is concluded that the rear end noise is a defect that substantially impairs the use and safety of the vehicle and, as such, it constitutes a nonconformity within the meaning of the statute." (Emphasis added).
It is clear that although there was some testimony before the arbitrators that the noise might indicate a problem with the differential, the arbitrators did not attempt to establish the source of the noise. It was the noise itself[1], a noise that was so loud that it could be heard over normal conversations and became an annoyance to those seated in the rear of the coach, that substantially impaired the use, value or safety of the vehicle. Under the arbitrators' decision, it did not matter from whence the noise came or why it appeared so loud in the coach.[2]
Ford was required to repurchase the vehicle. Ford appealed to the circuit court. It appears that there were two, and only two, legitimate issues for appeal based on the Board's ruling and Ford's position at arbitration: (1) whether the noise was as offensive as the Board determined (Ford's lawyer could have been a witness to this issue since he or she was present during the test), and (2) whether, even if the noise was as offensive as determined by the Board, it was so offensive as to rise to the level of a nonconformity. Ford made neither argument on appeal.
Instead, Ford attempted to prove, without success, that its differential was not defective. This was irrelevant. Even if the differential was determined to be in perfect *337 condition, the "howling or whining noise from the rear of the vehicle" was still present.[3] Ford's other argument was that its differential only emitted a "normal" noise which was rendered nonconforming only because of the malfeasance of Coachmen. This argument had been specifically waived before the Arbitration Board. As is required for an appeal from an arbitrator's award under the Lemon Law, the circuit court conducted a de novo review. The circuit court not only affirmed the decision of the Arbitration Board, but also found that the appeal was in bad faith and lacked a justiciable issue and assessed triple damages against Ford.[4] In this appeal, Ford does not challenge that the vehicle was a lemon; it urges only that the trial court erred in finding bad faith and assessing the increased damages.
The issue before us is whether there is record support for the judge's finding.
The first basis for the trial court's ruling was:
[Ford's agent] further testified that because the coach was welded directly to the Ford chassis without the use of pucks, the differential noise would be transferred from the axles to the frame to the body, and [Ford] blamed the objectional whining noise emanating from the differential on the lack of pucks. [Ford] testified that because Coachmen did not install the Ford pucks, the whining or howling noise from the differential could be heard in the coach. Thus even though Ford waived its right to assert a defense at the arbitration that Coachmen was liable for the nonconformity, Ford asserted as a defense that but for Coachmen's not installing the pucks, the objectional noise would not be present. Ford has acted in bad faith by attempting to place liability on Coachmen in the instant trial after waiving that right at arbitration.
As previously indicated, the record establishes that the Arbitration Board found that Ford stipulated that Coachmen should be dismissed because Coachmen was not "liable for the alleged nonconformity." This finding was not appealed.[5] Again, the alleged *338 nonconformity was not a faulty differential but rather the "howling or whining noise in the rear of the vehicle." On appeal, Ford urged that this noise would not have been heard in the coach had Coachmen properly installed the pucks (rubber insulators). This argument, as the trial judge found, attempted to place the blame for the nonconformity on Coachmen after stipulating that Coachmen was not responsible, thus permitting Coachmen to be dismissed from the action.[6] Even though this was a de novo review, it was still an appeal. Issues not raised before the arbitrator should not be presented during the de novo review or else the entire statutory arbitration process becomes a nullity.[7] Ford took the position before the Arbitration Board that the noise was "normal." No claim was made there that this "normal" noise was converted into a nonconformity because of the faulty workmanship of Coachmen. To present such argument before the judge during the de novo review when the consumer could no longer look to Coachmen for redress could be termed bad faith. That is not to say, and the trial judge did not so indicate, that this alone would justify treble damages. But it was clearly a part of the judge's concern about the manner in which Ford presented its appeal.
As the basis for its determination that the appeal was brought in complete absence of a justiciable issue, the court relied on the following testimony:
Ford Motor Company presented the testimony of David Griffis, a mechanic at South Lake Ford located in Clermont, Florida who testified, inter alia, that he replaced the ring gear and pinion in the subject vehicle twice and that when replacing the ring gear and pinion on the second occasion, he set the backlash on the ring gear and pinion to .005". Griffis further testified that if the backlash on the subject vehicle thereafter changed, without any human interference, to .007" that the differential would have to be defective. After Griffis set the backlash to .005", no Ford agents or agents for Starling altered the backlash.
J.R. Denman testified for Ford Motor Company that he observed the ring gear pattern on the subject vehicle to be shallow and not an acceptable wear pattern for a Dana differential according to the chart admitted into evidence. Denman further testified that the backlash should not "change more than .0005".
.... Caropresso further testified that he measured the backlash on the subject vehicle to be from .006" to .0075". Caropresso's testimony as to the backlash is not believed based on the testimony presented by Allen Brethorst. Even if Caropresso's testimony were to be believed, the subject *339 vehicle's differential would still be defective according to the testimony of Denman and Griffis, Ford Motor Company witnesses.
Because the court believed that Ford should have been aware of its own case before it filed the appeal and since its own witnesses revealed that the vehicle was nonconforming, the court determined that the appeal lacked a justiciable issue. At the very least, this shows that Ford did not fully examine its position before filing the appeal. Again, although this alone may not be sufficient to warrant the assessment of treble damages, it helps to explain why the court took such stern measures when it found that Ford offered manipulated evidenceby far the most serious of its transgressions.
The court found the Ford's representative manipulated the results of a test presented into evidence. Here the evidence shows that Caropresso, not only Ford's expert but also its representative, conducted a video recorded backlash test. During the test, Brethorst, Starling's expert, was present. First Brethorst testified that he observed Denman, an employee of Ford, set up the equipment to conduct the test. He saw Denman "pull it through a couple of times just to test his setup on it." Denman admitted doing these preliminary tests but could not recall their results. Brethorst, however, observed the Denman readings to be ten thousandths. This is outside the acceptable range. Before Caropresso started his video test, Brethorst got under the vehicle and twice conducted the test himself resulting in a reading of ten thousandths each time. Mr. Caropresso then conducted the video test showing a result of around seven thousandths which was within tolerance. Brethorst, who stood "behind [Caropresso] and to his right" during the test, explained the difference as follows:
Q. Okay. And why would Mr. Caropresso be reading backlash at seven to eight thousandths when you had just measured it three previous times and obtained a ten to eleven thousandths backlash?
A. Well, its really hard to say. I don't think he was pushing up on the gears as hard as he might be able to.
Q. Could you explain? Do you believe that Mr. Caropresso's measurements were accurate of backlash?
A. I do not.
* * * * * *
Q. And do you have any explanation as to how the backlash only read six to seven to eight thousandths of an inch during that time?
A. Well, the only explanation I couldI could render would be that possibly the ring gear wasn't moved upwards as forcefully as it might be able to.
Q. The ring gear didn't make contact full contact with the pinion?
A. That is correct.
Q. And would it be possible to make it or take an inaccurate reading of the backlash just using your thumbs and pressing as far to the reading that you want?
A. Manipulate it?
Q. Right.
A. Yeah. Sure.
Q. Manipulate it to the thousandths of an inch?
A. Like pulling an anchor, you can pull it all the way out of the water or not. And so if you don't move the ring gear as far as it could possibly go, you're not going to have whatever reading you want to have on the gauge.
Q. So it is important when you're measuring backlash that you move the ring gear as far as you can?
A. That's what you're trying to measure is how far it will go in either direction, forward or reverse.
The trial court viewed the video showing the amount of pressure exerted by Caropresso and based on the video and on Brethorst's testimony determined:
Caropresso also provided a videotape of an inspection of the subject vehicle he performed on January 31, 1997. Caropresso appears to have measured backlash at the following thousandths: 6, 6, 7, 7, 7, and 7.5 thousandth of an inch. Denman admitted that he measured backlash during the January 31, 1997 but could not recall what he measured. Brethorst testified though that *340 he saw Denman measure the backlash at the inspection in question and witnessed Denman measure .010 or ten thousandths of an inch. Upon examination of the Caropresso tape, one can see where Caropresso is delicately pushing the ring gear to obtain the reading he wants. On many occasions in the film Caropresso obtains several different readings in the same location which indicates that he is manipulating the results ... A careful review of the Caropresso tape shows that he is gently, with his thumb, pushing the ring gear to the point at which he wants it to read rather than pushing the ring gear as far as it will go to obtain the true reading.
Although Ford offered another explanation for the different readings, the court rejected such testimony. Determining credibility of witnesses is what trial judges (in the absence of juries) do. On appeal, Ford argues that the fact that the court believed Starling's expert and not Ford's is no reason to award treble damages. One cannot argue with this. But the court did not merely disbelieve Ford's expert, it found that he deliberately manipulated evidence. There is record support for the court's finding that the video test offered by Ford had been manipulated.
The legislature in enacting the Lemon Law decided to impose extra damages only on the manufacturer in the event of a "bad faith" appeal. Obviously, it was the legislative intent to discourage wealthy Goliaths from intimidating consumers who win awards before the Arbitration Board by subjecting them to the time and expense of meritless appeals in order for them to recover that which the law permits. The prospect of having to risk the expense of hiring a lawyer and employing an expert might well discourage many consumers from pressing their arbitration victory.
The trial court in this case decided that because Ford brought an appeal based in part on a defense that Coachmen was responsible for the nonconformity (a defense that it had waived before the arbitrators), because Ford asserted on appeal that its differential was not defective even though the testimony of its own employees indicated otherwise, and because Ford presented a video recording of a test conducted by its employee which manipulated the test results, the appeal was in bad faith. There is record support for the judge's decision.
AFFIRMED.
THOMPSON, J., concurs.
GRIFFIN, C.J., dissents, with opinion.
GRIFFIN, Chief Judge, dissenting.
I respectfully dissent.
Ford's position at the lemon law arbitration hearing was that the noise about which Mr. Starling complained was a normal noise emanating from the ring gear and pinion. Ford contended that the noise itself was not a defect nor did the noise indicate any mechanical defect in Ford's chassis. Rather, this otherwise normal engine noise was simply more audible because of the way the motor home had been affixed to the chassis by Coachman. It is unclear why the arbitration panel elected to dismiss Coachman over the objection of Mr. Starling. Consistent with their position that there was no defect in the vehicle, Ford agreed to the dismissal and waived any right to assert as a defense that Coachman was liable for the alleged nonconformity. The arbitration panel then found that the vehicle was a lemon because there was a "rear end" noise "created by the vehicle" that was "loud and annoying." The cause or source of this "noise" was not identified, however. Pursuant to section 681.1095, Florida Statutes (1992), Ford's right of appeal of this arbitration decision is by trial de novo in the circuit court. Ford invoked its right to appeal the arbitrators' decision. In response, Starling counterclaimed, asserting that the "noise" at issue "emanates from the differential where the ring gear and pinion are misaligned."
The majority has decided that, because the arbitration panel did not attempt to attribute a cause to the noise but merely found the noise itself to be a "defect," Ford acted in bad faith in attempting to establish in the trial de novo, as it previously had done in the arbitration, that the noise complained of was not caused by any defect in the Ford chassis. Ford's reference to the way in which the coach was welded to the chassis is merely *341 their explanation why normal ring gear and pinion noise is more pronounced than it would otherwise be. The majority calls this distinction "pure sophistry;" I do not find it to be sophistry at all. Ford maintained in the arbitration and maintained in the trial de novo that the noise was not excessive and that the noise did not indicate a mechanical defect alleged by Starling. In other words, as quoted in footnote 5 of the majority opinion, Ford's position from beginning to end was that the vehicle did not have a substantial impairment.
The statute under which this arbitration was conducted specifically requires that the appeal be a trial de novo. This is done, no doubt, in order to protect the parties' due process and court access rights. By finding Ford guilty of bad faith for appealing, Ford has not only been deprived of its trial de novo and has been punished for attempting to assert its statutory right, but has been cheated of its constitutional protections.
Plainly, the purpose of section 681.1095(13), Florida Statutes, is to discourage baseless or frivolous appeals, but there is nothing baseless or frivolous about this appeal. This trial involved a pure battle of the experts and it is apparent that this case ultimately turned on the court's finding that Ford's expert was not credible. "A careful review of the Caropresso tape shows that he is gently, with his thumb, pushing the ring gear to the point at which he wants it to read rather than pushing the ring gear as far as it will go to obtain the true reading." The fact that the trial court apparently accepted the plaintiff's argument that Caropresso's instrument readings were not credible will justify a verdict in favor of Starling but not an award of treble damages against Ford. To require a manufacturer to arbitrate rather than to litigate and then to find it guilty of bad faith and assess it treble damages when it attempts to exercise its statutory right of appeal makes this statute extremely unfair in its application.
NOTES
[1] Noise, in conjunction with other problems, has been held to be a nonconformity. See Creighbaum v. Mack Trucks, Inc., 161 Wis.2d 934, 469 N.W.2d 248 (Wisc.Ct.App.1991) (thumping and knocking noise and excessive engine vibration); Matter of Royal Chrysler-Oneonta, Inc., 243 A.D.2d 1007, 663 N.Y.S.2d 410 (N.Y.App.Div. 1997) (recurring noise and shifting problems). There is no reason that noise alone, if it is as obnoxious as that described herein so that it affects the "use, value or safety" of the vehicle, should not be a nonconformity.
[2] A noise this offensive would certainly affect the "value" of the vehicle because few would want to purchase a vehicle with this known condition.
[3] We have held that the consumer need only describe the "general problem" in seeking relief under the lemon law. Thus, Ford should have addressed directly the "howling or whining noise from the rear of the vehicle." Mason v. Porsche Cars of North America, Inc., 688 So.2d 361 (Fla. 5th DCA 1997).
[4] Ford complains, justifiably, that the trial judge signed a proposed judgment prepared by the attorney for Starling. There is a split of opinion on this court as to the propriety of this practice. In any event, we have reversed on this basis only when the signed judgment is inconsistent with an earlier pronouncement of the judge. That is not the case here. See generally White v. White, 686 So.2d 762 (Fla. 5th DCA 1997); Polizzi v. Polizzi, 600 So.2d 490 (Fla. 5th DCA 1992).
[5] Ford argues in its brief that it took the position before the arbitrators that the noise was "normal" and would not have been a concern but for the absence of the rubber insulators. The record cite, however, shows this to be untrue. Reading from the arbitration transcript, Ford's attorney stated:

"[B]eginning on line 20, `Do you intend to assert as a defense that Coachmen should be liable for repurchasing if in fact the vehicle is found to be a lemon?' And I answered: `Not at this time.' Mr. Fender says: `Will that approach change in the event that the Board decides to dismiss Coachmen?' And I answer, and I'm almost done here: `I feel like I'm being cross-examined. Ford's position is that the vehicle does not have a substantial impairment. Obviously I cannot anticipate what testimony might come up. But the reason why Ford Motor Company is here today is not because they believe there is a problem which they intend to blame somebody else for, but instead they believe that there is not a problem, period.'"
Nothing was said to the arbitrators about rubber insulators, or the lack of them. Instead, Ford's position before the arbitrators was that the noise was common in such vehicles and acceptable by other owners. On appeal, Ford urged that the noise created by its differential was normal but was rendered abnormal only because Coachmen failed to install the pucks which would have prevented the noise from being heard in the coach. This issue, if Ford intended to rely on it, should have been presented to the Arbitration Board.
To claim now, as Ford does, that on appeal it did not attempt to blame Coachmen for failing to install the insulators but merely tried to explain why it was not to blame for the excessive noise is pure sophistry. Arguing that the noise problem was created by Coachmen's failure to install the insulators admits that there is a noise problem. The noise became a problem either because it was noise emanating from the differential which was so excessive that it could be heard in the coach or else it was merely normal noise generated by the differential which became nonconforming only because the insulators were not installed. Ford's claim that it was unsuppressed, normal noise necessarily "blames" Coachmen for the problem.
[6] Ford had three opportunities to remedy the problem. If the offensive noise was caused by the lack of "pucks". Ford had ample opportunity to discover the problem and raise it when Coachmen asked to be discharged.
[7] In its brief, Ford argues that it is not bound by its presentation before the arbitration board and that it is free to submit such new and additional evidence it chooses as though there has been no arbitration decision. It cites Citrus Central v. Gardner, 569 So.2d 936 (Fla. 1st DCA 1990), for this proposition. Citrus Central, in dictum, did say: "[W]e note that a hearing de novo may encompass the presentation of new or additional evidence, by which the matter may be determined as if it had not been previously addressed." 569 So.2d at 937. Even this dictum, however, speaks of new evidence and not the introduction of new issues. Citrus Central relied on Carnegie v. Department of Public Safety, 60 So.2d 728 (Fla. 1952), as authority. Carnegie, on the other hand, referred to the law of Pennsylvania that it is the duty of the courts "to hear evidence and determine, in the exercise of its sound discretion and in the furtherance of justice, whether the license should be suspended" and held "[t]his would certainly seem to be the better rule where, as in this state, the Department is authorized to suspend without a hearing, and the operator may appeal directly to a court of record from such suspension, so that the hearing before the court is the first opportunity he has had to present his side of the story and to confront and cross-examine the witnesses against him." 60 So.2d at 731-32.

In our case, Ford had the opportunity to present its case and to confront and cross-examine the witnesses against it. Although Ford could, and perhaps did, present additional witnesses at the trial, it cannot add to the issues raised before the arbitration board or avoid stipulations made at the arbitration hearing.